**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

PALM PROPERTIES, LLC                                                                                       PLAINTIFF

v.                                              No. 4:09CV00038 JLH

CAPITOL DEVELOPMENT OF ARKANSAS, INC.;
PRIME REALTY & INVESTMENTS, INC.;
INDY 10, LLC; HOWARD BLOOM; ASHLEY BLOOM;
BOCA FUNDING GROUP, LLC; METROPOLITAN
NATIONAL BANK; C-METRO, INC., d/b/a CENTURY 21
METRO, INC.; and JOHN DOES                                                                         DEFENDANTS

**OPINION AND ORDER**

Palm Properties, LLC, brought this action for breach of contract, fraud, and civil conspiracy against the defendants regarding a contract for exchange of real estate between Palm Properties, Capital Development of Arkansas, Inc. ("CDA"), and Indy 10, LLC, a designee of CDA. As part of the contract, CDA advanced costs to Palm Properties, which Palm Properties was to repay by placing a sum of money in escrow for the escrow agent to use to pay outstanding liens on the real estate that Palm Properties was to receive in the exchange. After filing the first amended complaint, Palm Properties filed a motion for partial summary judgment seeking return of the funds placed in escrow. This Court denied summary judgment on the grounds that the complaint sought specific performance, and should specific performance be awarded, the funds would be needed to satisfy liens on the property. Palm Properties then amended its complaint to remove any request for specific performance, instead alleging that CDA materially breached the agreement and, as a result, Palm Properties is entitled to damages. Thereafter, Palm Properties filed a second motion for partial summary judgment. Defendants CDA, Indy 10, Howard Bloom, Ashley Bloom, and C-Metro have

responded to the motion. For the reasons set forth below, the plaintiff's motion for partial summary judgment is denied.

**I.**

On April 21, 2008, Palm Properties entered into an Exchange Agreement with CDA wherein Palm Properties agreed to exchange an apartment complex and storage unit in Indianapolis, Indiana, for two condominium units located in Toxaway Falls, North Carolina, and fourteen residential lots in Maumelle, Arkansas, that were owned by CDA.[1] In addition, CDA would pay $45,000 "[i]n order to equalize the respective equities of PALM and CDA." (Am. Compl. Ex. A ¶ 3.[2]) In the Exchange Agreement, both Palm Properties and CDA warranted that they were the sole owners of their respective properties in fee simple, "free and clear of all liens (other than such mortgages as shall be discharged at closing)." (*Id.* ¶¶ 14(a), 15(a).) The parties also agreed to convey their properties at closing "free from all encumbrances except as hereinafter specifically set forth." (*Id.* ¶ 1(A)-(B).) Closing was set to take place on or before May 30, 2008.

Palm Properties and CDA amended the Exchange Agreement at CDA's request on May 19, 2008. The parties set a new closing date of June 20, 2008, and CDA agreed to reimburse Palm Properties up to $4,000 at closing for making improvements to its Indiana property.

On June 6, 2008, Palm Properties and CDA signed a Second Amendment to the Contract, this time in large part due to fire damage to Palm Properties' Indiana property. Per the amendment,

---

[1] Per the Exchange Agreement, the Maumelle Property included: Lots 20, 21, 25, 26, and 36 of Osage Terrace, Phase 1-C; Lots 6, 16, 54, and 67 of Osage Terrace, Phase 1-B; and Lots 208, 209, 212, 213, and 217 of Osage Terrace Addition.

[2] These exhibits are incorporated by reference into the plaintiff's second amended complaint.

CDA would exchange three condominium units in North Carolina (rather than two) and ten single family lots in Maumelle, Arkansas, (rather than fourteen) for Palm Properties' apartment complex and storage unit in Indiana.[3] CDA also agreed to make a $60,425 equity equalization payment at closing rather than the $40,000 payment specified in the Exchange Agreement. The parties agreed that, upon execution of the amendment, CDA would convey to Palm Properties Lot 16 of the Maumelle Property as a non-refundable deposit. The closing date was extended to "on or before ten (10) days after the completion of the repairs and reconstruction of the Damaged Building required to be completed by PALM." (Am. Compl. Ex. C ¶ 5.) After the amendment was executed, CDA conveyed Lot 16 of the Maumelle Property to Palm Properties.

On July 15, 2008, CDA conveyed a mortgage lien to Harper Construction Company for Lot 208 of Osage Terrace Addition. Although Lot 208 had been named in the original Exchange Agreement, it was not included in the Second Amendment to the Contract as part of the Maumelle Property.

On August 26, 2008, CDA conveyed a mortgage lien to Scott D. Williams, Harris B. Williams, Jr., and Ronald D. Ciaravella for nine of the ten lots named in the Second Amendment to the Contract as comprising the Maumelle Property.[4] The parties dispute whether Palm Properties was notified of the lien.

---

[3] The Maumelle Property, as amended, included: Lots 21, 25, and 26 of Osage Terrace, Phase 1-C; Lots 6, 16, 54, and 67 of Osage Terrace, Phase 1-B; Lots 212 and 213 of Osage Terrace Addition; and Lot 7 of Osage Falls, Phase IV.

[4] The lien was on Lots 21, 25, and 26 of Osage Terrace, Phase 1-C; Lots 6, 54, and 67 of Osage Terrace, Phase 1-B; Lots 212 and 213 of Osage Terrace Addition; and Lot 7 of Osage Falls, Phase IV.

Palm Properties and CDA executed a Closing Agreement on October 17, 2008, which constituted "an amendment to the Contract." (Am. Compl. Ex. F ¶ 11.) The Agreement stated that "Palm does not currently have available the funds necessary for it to close upon the transaction contemplated by the Contract, such funds being necessary to pay and prorate taxes and to pay closing costs and expenses." (*Id.* at 1.) Thus, Palm Properties requested that CDA "advance such funds on behalf of Palm Properties with such funds to be reimbursed post closing," and CDA expressed its willingness to do so, through its designee, Indy 10, in order to bring about the closing. (*Id.*) To that end, CDA designated Indy 10 as the entity to which Palm Properties should convey the title to its apartment complex and storage unit. In the Closing Agreement, the parties amended the description of the property to be conveyed at closing; they changed the Maumelle Property to include thirteen residential lots (increased from ten)[5] and the Toxaway Property to include two condominium units (decreased from three), and they stipulated that CDA would not be required to pay any equalization payment (neither the $40,000 described in the Exchange Agreement nor the $60,425 described in the Second Amendment to the Contract) or the $4,000 reimbursement payment required by the First Amendment to the Contract. The Closing Agreement also provided that Palm Properties would assign to Indy 10, LLC, or its designee, the rights and claims to the insurance policies issued to Palm Properties.

According to the Closing Agreement, "[a]t closing CDA or its designee, Indy 10, LLC, shall advance and/or assume all of the taxes . . . and closing costs which would otherwise . . . be the

---

[5] The Maumelle Property included the previously conveyed Lot 16 of Osage Terrace Addition, the nine remaining lots per the Second Amendment to the Contract, and three additional lots: Lots 208 and 217 of Osage Terrace Addition and Lot 20 of Osage Terrace Addition, Phase 1-C.

obligation of Palm" up to $175,000. (*Id.* ¶ 7.) The parties agreed that CDA would convey the Toxaway Property and one lot of the Maumelle Property at the time of closing;[6] the remaining eleven lots were to be delivered into escrow with Metropolitan Title Company, doing business as Triad Title Company ("Triad"). Palm Properties would be entitled to receive the remaining lots if certain conditions were met:

> A. If within sixty (60) days after the closing date, Palm shall have repaid to CDA's designee, Indy 10, LLC, the full amount of the Advancement (**plus** such other amounts as represent obligations of Palm with respect to the Palm Property for work completed prior to October 17, 2008, which were unpaid, unknown or undisclosed at closing and which have been identified or asserted within the aforesaid sixty (60) day period) (the "Additions") and **less** such amounts . . . which, although the obligation of CDA per the Contract, are hereby assumed and agreed to be paid outside of closing by Palm (the "Subtractions")) . . . to the Escrow Agent, and shall have provided evidence thereof to the CDA, then the Escrow Agent shall record the deed to the Remaining Maumelle Lots and the Additional Maumelle Lots not yet recorded for the benefit of Palm . . . *shall utilize the funds received in repayment of the Advancement (as adjusted) to remove any encumbrances from the Remaining Maumelle Lots* and to defray any costs related thereto as listed on the closing statement; and the Escrow Agent shall pay the remainder of the funds received in repayment of the Advancement, if any, to CDA's designee, Indy 10, LLC. *If after receiving from Palm the funds for repayment of the Advancement, the Escrow Agent determines that the funds so received are insufficient to remove all encumbrances from the Remaining Maumelle Lots and the Additional Maumelle Lots* not yet recorded . . . the Escrow Agent shall so notify CDA . . . .
>
> B. If upon the expiration of sixty (60) days after the closing date ("Maturity Date"), Palm shall NOT have repaid to CDA's designee, Indy 10, LLC, the full amount of the Advancement plus the Additions and less the Subtractions in the manner described in subsection A. . . . in that event
>
>> (1) Palm may elect . . . to give back to CDA one (1) lot for each $47,000.00 or part thereof of the Additions that are unpaid . . . or
>>
>> (2) Palm may extend the Maturity Date for the unpaid portion of the Additions for an additional forty-five (45) days . . . .

---

[6] Lot 20 of Osage Terrace Addition, Phase 1-C was to be conveyed at closing.

(*Id.* ¶ 7) (emphases added). The total advancement as listed in the Closing Agreement totaled $158,712.54. The subtractions from the advancement, which were listed in an exhibit attached to the Closing Agreement, totaled $10,160.18. On December 3, 2008, less than sixty days after the closing date, a list of additions to the advancement in the amount of $19,032.15 was sent to Jordan Morgenstern and Steve Kiner. (Def. St. of Facts Ex. C.) According to CDA, this made the adjusted advancement—the advancement less the subtractions plus the additions—$167,584.51.

The Closing Agreement also stipulated that, in the event that Palm Properties did not repay the adjusted advancement,

> [CDA] shall have no further obligation to convey the Remaining Maumelle Lots to Palm and Palm shall have no further right to obtain the conveyance of the Remaining Maumelle Lots; (2) Palm shall be excused from any further obligation to repay the Advancement; and (3) the transaction contemplated by the Contract shall be deemed fully closed.

(Am. Compl. Ex. F ¶ 7(B).)

On December 9, 2008, Palm Properties wired $148,552.36 to the Escrow Agent (Triad)—the amount of the advancement less the subtractions. However, Palm Properties did not pay the additions totaling $19,032.15. Nor did Palm Properties exercise either of the methods of extending the maturity of the repayment of the adjusted advancement as set forth in the Closing Agreement. Rather, on December 19, 2008, Palm Properties filed suit against CDA, Indy 10, and Triad in state court for breach of contract. The next day, CDA conveyed Lots 208 and 217 of Osage Terrace Addition to Defendant Boca Funding via a warranty deed dated December 23, 2008. Subsequently, the case was removed to this Court and the complaint amended to include other interested parties and causes of action.

On July 16, 2009, C-Metro, a creditor of CDA, filed an application for writ of garnishment in Pulaski County Circuit Court. C-Metro seeks to obtain the funds that Triad had held in escrow as payment for CDA's debt.

## II.

In its brief, C-Metro asks the Court to abstain from ruling on the plaintiff's summary judgment motion because of the garnishment proceeding in state court. C-Metro cites to the *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976), *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943), and *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S. Ct. 1070, 3 L. Ed. 2d 1058 (1959), for support.[7]

"Federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them,' even when there is a pending state court action involving the same subject matter." *Mtn. Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 926 (8th Cir. 2006) (quoting *Colo. River*, 424 U.S. at 813-17) (internal citations omitted). "Abdication of the obligation to decide cases can be justified under [the abstention] doctrine[s] only in the *exceptional circumstances* where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *Id.* (quoting *Moses H. Cone Mem. Hosp. v. Mercury Constr.*, 460 U.S. 1, 14, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)) (emphasis in original).

---

[7] Although C-Metro names all three abstention doctrines in its brief, the Court notes that C-Metro makes little effort to elaborate on the doctrines or their applicability to the case at hand. The section of C-Metro's brief pertaining to abstention is copied entirely from Wikipedia. *See* "Abstention Doctrine," WIKIPEDIA, <http://en.wikipedia.org/wiki/Abstention_doctrine>.

C-Metro argues that, pursuant to the factors set forth in *Colorado River*, this case presents "exceptional circumstances," making abstention appropriate. Under the *Colorado River* abstention, determining whether exceptional circumstances exist requires an evaluation of the following factors:

> (1) whether there is a res over which one court has established jurisdiction, (2) the inconvenience of the federal forum, (3) whether maintaining separate actions may result in piecemeal litigation, unless the relevant law would require piecemeal litigation and the federal court issue is easily severed, (4) which case has priority—not necessarily which case was filed first but a greater emphasis on the relative progress made in the cases, (5) whether state or federal law controls, especially favoring the exercise of jurisdiction where federal law controls, and (6) the adequacy of the state forum to protect the federal plaintiff's rights.

*U.S. Fid. & Guar. Co. v. Murphy Oil USA, Inc.*, 21 F.3d 259, 263 (8th Cir. 1994). These factors are not exhaustive, nor are they mechanically applied. *Mtn. Pure, LLC*, 439 F.3d at 926. Rather, "they are pragmatically applied to advance the clear federal policy of avoiding piecemeal adjudication." *Id.* (internal quotations omitted). "When examining the factors, the balance is heavily weighted in favor of the exercise of jurisdiction." *Id.* (quoting *Moses H. Cone*, 460 U.S. at 16) (internal quotations omitted).

With these considerations in mind, we turn to the case at hand to determine whether it presents exceptional circumstances that warrant abstention. The first factor weighs against abstaining from exercising jurisdiction. On August 21, 2009, Triad filed a counterclaim and crossclaim for interpleader, alleging that it held the escrowed funds and deeds, had no interest in the funds or real estate, and planned to deposit the funds into the registry of the Court. On December 14, 2009, Triad filed a motion to deposit the funds into the Court's registry. Neither C-Metro nor any other defendant objected to the motion. The Court has granted Triad's motion to deposit the funds

at issue in this case into the registry of the Court, and in so doing has established jurisdiction over the funds.

Likewise, the second factor—inconvenience of the federal forum—weighs against abstention. Both the state and federal proceedings are located in the same city; thus, "there is no appreciable difference in the level of inconvenience between the two fora." *Mtn. Pure, LLC*, 439 F.3d at 926.

The desire to avoid piecemeal litigation, which is the third factor in the *Colorado River* analysis, weighs against abstention because the state action involves different issues of fact and law than the federal case—they are not merely duplicative parallel proceedings. "The policies underlying *Colorado River* abstention are considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Mtn. Pure, LLC*, 439 F.3d at 927 (quoting *Colorado River*, 424 U.S. at 817, 96 S. Ct. 1236) (internal quotations omitted). "We respect these considerations by favoring the most complete action." *Id.* Here, C-Metro filed an application for writ of garnishment in state court and seeks to acquire the funds that were held in escrow as payment for a debt incurred by CDA. Meanwhile, Palm Properties filed a complaint in federal court alleging breach of contract, fraud, and civil conspiracy against CDA and its co-defendants. C-Metro was named in that case because the plaintiff believes C-Metro "may claim an interest in some of the real property at issue in the current litigation." (Am. Compl. ¶ 5I.) The federal and state cases address separate issues: The federal case addresses whether CDA and its co-defendants are liable on any of the claims alleged and whether, based on the terms of the contract, the funds and property held in escrow ever transferred to CDA. The state case, in contrast, will determine whether C-Metro, as CDA's creditor, is entitled to those funds if in fact CDA became the rightful owner.

C-Metro offers no evidence that its application for writ of garnishment in state court has progressed substantially since it was filed in July 2009. In contrast, a brief glance at the docket of the case in this Court indicates how far this case has progressed. Since the complaint was filed in January 2009, this Court has issued a final scheduling order, granted Triad leave to file a counterclaim and crossclaim for interpleader, and denied the plaintiff's first motion for summary judgment. The case is less than two months from the close of discovery and four months from trial. If any case has priority, based on the evidence presented, it is the federal case.

It is undisputed that this action is governed by state law. "The presence of state law issues, however, only weighs in favor of abstention in rare circumstances. There is nothing about this case which makes it unusual from similar diversity cases handled by federal courts everyday. Thus, this issue does not weigh in favor of abstention." *Mtn. Pure, LLC*, 439 F.3d at 927 (internal citation omitted).

Finally, there is nothing to indicate that this Court cannot adequately protect the plaintiff's rights. The federal court is capable of adjudicating all of the issues raised in the complaint; thus, the adequacy of the federal forum weighs against abstention. *See id.*

In spite of C-Metro's contention, the *Colorado River* abstention is not applicable to the present case. Because C-Metro also mentions, but does not discuss, two other abstention doctrines, the Court will briefly dispose of them here.

The *Burford* abstention applies "when a state has established a complex regulatory scheme supervised by state courts and serving important state interests, and when resolution of the case demands specialized knowledge and the application of complicated state laws." *In re Otter Tail Power Co.*, 116 F.3d 1207, 1215 (8th Cir. 1997). Here, the federal case does not involve a complex

regulatory scheme but basic issues of contract interpretation. Nothing about the law of contracts in Arkansas is so specialized or technical that it renders this Court incapable of resolving the dispute.

Likewise, the *Thibodaux* abstention mentioned by C-Metro is inapplicable. *Thibodaux* involved an issue of state law that had not yet been interpreted by state courts. The Supreme Court in that case determined that it was appropriate for the district court to stay its proceedings pending the submission of the state law question to state determination. *Thibodaux*, 360 U.S. at 30, 79 S. Ct. at 1074. Here, C-Metro does not offer and the Court does not find that the complaint raises any uninterpreted state law issues. Thus, this Court will not abstain from exercising jurisdiction over the federal case.[8]

### III.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party carries its burden, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

---

[8] In its brief, Defendant C-Metro also raises two affirmative defenses: equitable estoppel and the doctrine of unclean hands. However, because the Court finds neither defense particularly relevant to the plaintiff's summary judgment motion, the Court considers the motion for summary judgment on its merits.

11

475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2552.

## IV.

In its motion for partial summary judgment, Palm Properties asks this Court to find that Palm Properties is the rightful owner of the funds that have been held in escrow by Triad and order the funds to be returned to Palm Properties. In support of its motion, Palm Properties alleges that it held title to the funds in escrow when the funds were deposited, and CDA failed to satisfy a condition in the Exchange Agreement necessary to transfer the funds to CDA because CDA did not remove all encumbrances from the Maumelle Property by the closing date.

In the Exchange Agreement, Palm Properties and CDA agreed to convey their properties at closing "free from all encumbrances except as hereinafter specifically set forth." (Am. Compl. Ex. A ¶ 1(A)-(B).) In the Closing Agreement, the parties amended the Exchange Agreement to include the following provision:

> If within sixty (60) days after the closing date, Palm shall have repaid to CDA's designee, Indy 10, LLC, the full amount of the Advancement (**plus** such other amounts as represent obligations of Palm with respect to the Palm Property for work completed prior to October 17, 2008, which were unpaid, unknown or undisclosed at closing and which have been identified or asserted within the aforesaid sixty (60) day period) (the "Additions") and **less** such amounts . . . which, although the obligation of CDA per the Contract, are hereby assumed and agreed to be paid outside of closing by Palm (the "Subtractions")) . . . to the Escrow Agent, and shall have provided evidence thereof to the CDA, then the Escrow Agent shall record the

> [remaining deeds] to the [Maumelle Lots] for the benefit of Palm . . . *shall utilize the funds received in repayment of the Advancement (as adjusted) to remove any encumbrances from the Remaining Maumelle Lots* and to defray any costs related thereto as listed on the closing statement; and the Escrow Agent shall pay the remainder of the funds received in repayment of the Advancement, if any, to CDA's designee, Indy 10, LLC. If after receiving from Palm the funds for repayment of the Advancement, the Escrow Agent determines that the funds so received are insufficient *to remove all encumbrances from the Remaining Maumelle Lots and the Additional Maumelle Lots* not yet recorded . . . the Escrow Agent shall so notify CDA . . . .

(Am. Compl. Ex. F ¶ 7) (emphases added). Pursuant to the Closing Agreement, the funds received from Palm Properties after the closing date in repayment of the advancement were to be used to remove "any encumbrances" from the Remaining Maumelle Lots and the Additional Maumelle Lots not yet recorded. (*See id.*)

Palm Properties argues that because it placed the funds at issue in escrow, it held title to those funds unless and until CDA removed the encumbrances from the Maumelle Property. Palm Properties lists three particular encumbrances that CDA placed on the Maumelle Property while the property was under contract: (1) the July 2008 mortgage lien on Lot 208 of the Osage Terrace Addition,[9] (2) the August 2008 mortgage lien on nine lots under contract to Palm Properties, and (3) the November 2008 mortgage lien on Lots 208 and 217 of the Osage Terrace Addition. In addition, Palm Properties claims that CDA breached the agreement with Palm Properties when it conveyed Lots 208 and 217 of the Osage Terrace Addition to Boca Funding on December 20, 2008. As CDA points out, however, the funds that Palm Properties placed in escrow were a repayment of an advance from Indy 10, LLC. Although the Closing Agreement included a provision whereby Palm Properties could decline to repay the advancement and give up its right to receive the remaining lots, the

---

[9] At the time Lot 208 was mortgaged, however, it was not one of the properties contracted to Palm Properties, per the Second Amendment to the Contract.

13

agreement did not clearly and unambiguously state what should happen if Palm Properties paid some but not all of the advancement. In other words, the Court cannot say that the undisputed facts show that Palm Properties held title to the funds in escrow.

Even if the Court could conclude that Palm Properties held title to the funds in escrow, it cannot determine as a matter of law that CDA's obligation to remove the encumbrances from the Maumelle Property had ripened. CDA argues that repayment of the advancement *in toto* was a condition pursuant to its obligation to remove the encumbrance, that the condition precedent has not been met, and therefore its obligation to clear the encumbrances has never ripened. According to CDA, Palm Properties did not repay the total amount of the adjusted advancement as set forth in the Closing Agreement because it did not pay the total amount of the additions to the advancement ($19,032.15) that had been submitted by email. Rather, Palm Properties paid $148,552.36—the amount of the advancement less the subtractions. Palm Properties alleges that it paid CDA the total amount of the adjusted advancement, which it contends was $148,552.36. Palm Properties does not say whether it was notified of any additions to the advancement, and whether such additions, if any, were properly identified and submitted as per the Closing Agreement. In light of this evidence, there are genuine issues of fact as to whether Palm Properties fully repaid the adjusted advancement within sixty days of closing, and so there is a genuine issue of material fact as to whether the condition precedent to CDA's obligation to remove the encumbrances was met.

CDA also argues that the agreement obligated Palm Properties to assign its rights and claims under the insurance policies as required by the Closing Agreement. It appears from evidence submitted by CDA that an assignment was executed, but the insurance company would not recognize it as valid. CDA argues that Palm Properties breached the contract by failing to execute a valid

assignment of the insurance rights and therefore cannot recover for breach with respect to failure to use the repayment of the advancement to remove encumbrances.

Palm Properties has not responded to CDA's arguments. A genuine issue of material fact remains as to whom the funds belong.

## CONCLUSION

For the reasons stated in this Opinion and Order, the plaintiff's motion for partial summary judgment is DENIED. Document #53.

IT IS SO ORDERED this 24th day of February, 2010.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE