IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

PALM PROPERTIES, LLC                                                                                    PLAINTIFF

v.                                                    No. 4:09CV00038 JLH

METROPOLITAN NATIONAL BANK;
C-METRO, INC., d/b/a CENTURY 21
METRO, INC.; and DOES                                                                                DEFENDANTS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

At issue in this case is whether Palm Properties, LLC, or C-Metro, Inc., is entitled to funds in the amount of $124,650.43 that were deposited into the registry of the Court by an escrow agent following a contract dispute between Palm Properties and Capitol Development of Arkansas, Inc. ("CDA"). A one-day bench trial was held on June 21, 2010. Palm Properties argued that CDA breached the Closing Agreement by failing to transfer title to the property free and clear of all encumbrances and that Palm is entitled to the funds as a result of CDA's breach. C-Metro argued that Palm Properties breached the terms of the Closing Agreement and, because C-Metro obtained a writ of garnishment over property belonging to CDA, it is entitled to the funds. The case is now ripe for a decision.

**I.**

Palm Properties entered into an Exchange Agreement with CDA, through CDA's officers Howard and Ashley Bloom, wherein Palm agreed to exchange an apartment complex and storage unit in Indianapolis, Indiana, for a number of condominium units in Toxaway Falls, North Carolina, (hereinafter the "Toxaway Property") and residential lots in Maumelle, Arkansas (hereinafter the "Maumelle Property"), that were owned by CDA. The Exchange Agreement was amended twice.

Among other things, Palm agreed to furnish a current rent roll of its apartment complex in Indiana to CDA, which it did.

Per the Second Amendment to the Contract, CDA agreed to exchange three condominium units in Toxaway Falls and ten single family lots in Maumelle for Palm's apartment complex and storage unit in Indiana.[1] Upon execution of this Second Amendment, CDA conveyed to Palm Properties Lot 16 of the Maumelle Property as a non-refundable deposit.

Palm Properties and CDA executed a Closing Agreement on October 17, 2008. Because Palm Properties did not have the funds available to close, it requested that CDA provide the funds for closing. CDA agreed that at closing either it or its designee, Indy 10, LLC,[2] would assume, or "advance," all of the taxes and closing costs that would otherwise be the obligation of Palm up to $175,000, and Palm Properties would convey its apartment complex and storage unit to Indy 10 "as is." Palm also agreed to include in its closing documents a duly executed assignment of Palm's rights and claims under its insurance policies and an updated rent roll. Palm provided a signed and notarized form assigning all of Palm's rights under the policies to Indy 10, as well as an updated rent roll.

In the Closing Agreement, the parties amended the description of the property that CDA would convey; they changed the Maumelle Property to include thirteen residential lots (increased

---

[1] The Maumelle Property included: Lots 21, 25, and 26 of Osage Terrace, Phase 1-C; Lots 6, 16, 54, and 67 of Osage Terrace, Phase 1-B; Lots 212 and 213 of Osage Terrace Addition; and Lot 7 of Osage Falls, Phase IV.

[2] CDA and Indy 10 have the same address, and Ashley and Howard Bloom, the officers of CDA, are also the managers of Indy 10.

from ten)[3] and the Toxaway Property to include two condominium units (decreased from three). The parties agreed that CDA would convey the Toxaway Property and one lot of the Maumelle Property at the time of closing;[4] the remaining eleven lots were to be delivered into escrow with Metropolitan Title Company, doing business as Triad Title Company ("Triad"). Palm Properties would be entitled to receive the remaining lots if certain conditions were met:

> A. If within sixty (60) days after the closing date, Palm shall have repaid to CDA's designee, Indy 10, LLC, the full amount of the Advancement (**plus** such other amounts as represent obligations of Palm with respect to the Palm Property for work completed prior to October 17, 2008, which were unpaid, unknown or undisclosed at closing and which have been identified or asserted within the aforesaid sixty (60) day period) (the "Additions") and **less** such amounts (**i.e. $10,160.18**) as are detailed on Exhibit "C" attached hereto . . . which, although the obligation of CDA per the Contract, are hereby assumed and agreed to be paid outside of closing by Palm (the "Subtractions")) . . . to the Escrow Agent, and shall have provided evidence thereof to the CDA, then the Escrow Agent shall record the deed to the Remaining Maumelle Lots and the Additional Maumelle Lots not yet recorded for the benefit of Palm . . . shall utilize the funds received in repayment of the Advancement (as adjusted) to remove any encumbrances from the Remaining Maumelle Lots and to defray any costs related thereto as listed on the closing statement; and the Escrow Agent shall pay the remainder of the funds received in repayment of the Advancement, if any, to CDA's designee, Indy 10, LLC. If after receiving from Palm the funds for repayment of the Advancement, the Escrow Agent determines that the funds so received are insufficient to remove all encumbrances from the Remaining Maumelle Lots and the Additional Maumelle Lots not yet recorded . . . the Escrow Agent shall so notify CDA . . . .
>
> B. If upon the expiration of sixty (60) days after the closing date ("Maturity Date"), Palm shall NOT have repaid to CDA's designee, Indy 10, LLC, the full amount of the Advancement plus the Additions and less the Subtractions in the manner described in subsection A. . . . in that event

---

[3] The Maumelle Property included the previously conveyed Lot 16 of Osage Terrace Addition, the nine remaining lots per the Second Amendment to the Contract, and three additional lots: Lots 208 and 217 of Osage Terrace Addition and Lot 20 of Osage Terrace Addition, Phase 1-C.

[4] Lot 20 of Osage Terrace Addition, Phase 1-C was to be conveyed at closing.

>    (1)  Palm may elect . . . to give back to CDA one (1) lot for each $47,000.00 or part thereof of the Additions that are unpaid . . . or
>
>    (2)  Palm may extend the Maturity Date for the unpaid portion of the Additions for an additional forty-five (45) days . . . .

(Am. Compl. Ex. F ¶ 7.)  The Closing Agreement also stipulated that, in the event that Palm Properties did not repay the adjusted advancement,

> [CDA] shall have no further obligation to convey the Remaining Maumelle Lots to Palm and Palm shall have no further right to obtain the conveyance of the Remaining Maumelle Lots; (2) Palm shall be excused from any further obligation to repay the Advancement; and (3) the transaction contemplated by the Contract shall be deemed fully closed.

(*Id.*)

The Settlement Statement listed an advancement of $158,712.54.  Exhibit C of the Closing Agreement listed subtractions totaling $10,160.18.  Within sixty days of closing, CDA sent Palm Properties an itemized list of additions totaling $19,032.15.  Palm's attorney responded that only $800 of the $19,032.15 fit within the definition of "additions" provided in the Closing Agreement since many of the alleged additions were for work performed after closing and after Indy 10 took title to the property as is.  Palm's attorney also stated that he believed the subtractions should also include an additional $10,095.26 for repairs that CDA was supposed to make to the Toxaway Property prior to closing but did not.  Palm contended that it was only obligated to pay $138,263.41.  Nonetheless, on December 9, 2008, Palm Properties wired $148,552.36 to the Escrow Agent (Triad): the total amount of the advancement listed in the Settlement Statement minus the subtractions listed in the Closing Agreement.

Following Palm's payment, CDA did not remove the encumbrances from the escrowed property, and Triad did not transfer title of the property to Palm Properties.  On December 19, 2008,

Palm Properties filed suit against CDA, Indy 10, and Triad in state court for breach of contract. Subsequently, the case was removed to this Court and the complaint amended to include other interested parties and causes of action.

In 2007, C-Metro, a company doing business with CDA, commenced a state court action against CDA over a business dispute. In 2007, CDA began to transfer its Arkansas property to out-of-state corporations, most of which were controlled by Howard or Ashley Bloom. Following a motion for sanctions filed by C-Metro in the state court action, CDA transferred all of its remaining real estate assets in Arkansas to Hope Family Partners, LLC, a Wyoming corporation. On March 3, 2009, C-Metro obtained a default judgment against CDA. To recover on its default judgment, C-Metro served a garnishment on Triad on July 16, 2009, for property owned by CDA and held by Triad. On December 7, 2009, C-Metro was named as a defendant in this action.

## II.

C-Metro claims that it has an ownership interest in the funds that Palm deposited with Triad. To establish an ownership interest, C-Metro must prove that the funds belonged to CDA—not to Indy 10 or to Palm Properties. *See Saunders v. Adcock*, 249 Ark. 856, 859, 462 S.W.2d 219, 221 (Ark. 1971) (finding that a garnishment is generally not effective against property that belongs to someone other than the debtor). Since the Closing Agreement specifies that the advancement was to be repaid to Indy 10 rather than to CDA, C-Metro cannot establish that the funds belonged to CDA unless the designation of Indy 10 as the recipient of the repayment was fraudulent. *S. Lumber Co. v. Riley*, 224 Ark. 298, 304, 273 S.W.2d 848, 852 (1955) (determining that a garnishment may be available as a remedy when property has been fraudulently assigned to someone other than the debtor for the purpose of defrauding creditors).

A transfer or conveyance is fraudulent if the debtor made the transfer with the actual intent to hinder, delay, or defraud creditors. *Laird v. Weigh Sys. S. II, Inc.*, 98 Ark. App. 393, 395, 255 S.W.3d 900, 902 (2007). "Fraud is never presumed, but must be affirmatively proved, and the burden of proving fraud is upon the party who alleges it and relies on it." *Rees v. Craighead Inv. Co.*, 251 Ark. 336, 341, 472 S.W.2d 92, 95 (1971). Indicia of fraud include "insolvency or indebtedness of the transferor, inadequate or fictitious consideration, retention by debtor of property, pendency or threat of litigation, secrecy or concealment, and the fact that disputed transactions were conducted in a manner differing from usual business practices." *Id.*

C-Metro falls short of proving fraud by a preponderance of the evidence. The Closing Agreement designated Indy 10 as the entity to which title to the Indiana property would be conveyed at closing. The Closing Agreement also stated that CDA *or its designee Indy 10* would advance the funds for taxes and closing. Although CDA, through its agents Howard and Ashley Bloom, asked Palm to repay the advancement to Indy 10 rather than CDA at a time when litigation was pending against CDA in state court, CDA did not transfer the funds to Indy 10 in a manner suggestive of fraud. Ashley Bloom testified under oath that Indy 10 was formed to purchase the real estate in Indiana from Palm Properties because CDA could not obtain a loan. In other words, Indy 10 was created for the purpose of obtaining the loan. Ashley Bloom also said that corporations often form new LLCs to purchase assets, and Steve Kiner, an owner of Palm Properties, testified that he was not surprised that CDA formed a new LLC to make the asset purchase. C-Metro points out that, over the course of the state court litigation, CDA transferred all of its Arkansas real estate to out-of-state companies, most of which were either directly or indirectly controlled by Howard or Ashley Bloom. However, in this case, CDA did not transfer property that it owned to Indy 10; it simply designated

Indy 10, the entity that had obtained the loan for the asset purchase, as the entity with which Palm Properties should transact. The Settlement Statement shows that Indy 10 borrowed $860,000 to close this transaction. The evidence does not show that CDA transferred funds to Indy 10 to use for the advancement of the closing costs. C-Metro has failed to prove that the Closing Agreement's directing that the advancement be repaid to Indy 10 instead of CDA was fraudulent. Consequently, the garnishment of property owned by CDA does not apply to the funds repaid to Indy 10.

C-Metro and Palm Properties dispute whether Palm breached the terms of the Closing Agreement by failing to repay the full amount of the adjusted advancement and by failing to elect one of two alternatives to repayment.[5] If Palm Properties did not repay the full amount of the advancement by the maturity date, or elect one of the two alternatives listed in subsection B of paragraph 7 within two days of the maturity date, then, according to the Closing Agreement:

> (1) CDA (including its designee, Indy 10, LLC) shall have no further obligation to convey the Remaining Maumelle Lots to Palm and Palm shall have no further right to obtain the conveyance of the Remaining Maumelle Lots, (2) Palm shall be excused from any further obligation to repay the Advancement; and (3) the transaction contemplated by the Contract shall be deemed fully closed.

(*Id.*)

Ultimately, whether Palm Properties breached the Closing Agreement has no effect on the outcome of this case. C-Metro has failed to prove the fraud that it needed to prove to be entitled to the funds. The funds belong either to Indy 10 or Palm Properties. Palm Properties owed the funds to Indy 10 upon the satisfaction of certain conditions. Palm Properties and Indy 10 disagreed as to

---

[5]C-Metro also argued that Palm breached the Agreement by failing to provide CDA with an accurate rent roll or to assign its rights under the insurance policies to CDA. At closing, Palm provided a signed and authenticated assignment of rights to CDA. Palm also provided CDA with a rent roll that it updated several times.

whether those conditions were met. Palm Properties and Indy 10, however, have settled that disagreement, and Indy 10 has waived its claim to those funds. As a result, Palm Properties is entitled to the funds.

## CONCLUSION

For the reasons stated above, a judgment in favor of Palm Properties will be entered separately. After 14 days from the entry of the judgement, the funds in the amount of $124,650.43 plus accrued interest will be released to Palm Properties from the registry of the Court unless a motion for stay is filed pursuant to Rule 62 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED this 30th day of June, 2010.

*/s/ J. Leon Holmes*
_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE